UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

BRIAN MILLET                                    CIVIL ACTION

VERSUS                                          NO. 18-7539

NANCY A. BERRYHILL, ACTING                      SECTION "A"(2)
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Plaintiff Brian Millet, proceeding pro se, seeks judicial review pursuant to Section

405(g) of the Social Security Act (the "Act") of the final decision of the Commissioner of

the Social Security Administration (the "Commissioner"), denying plaintiff's claim for a

period of disability and disability insurance benefits ("DIB") under Title II of the Act.  42

U.S.C. § 1382c. This matter was referred to a United States Magistrate Judge pursuant to

28 U.S.C. § 636(b) and Local Rule 73.2E(B).

I.    PROCEDURAL HISTORY

On July 26, 2013, Millet filed a Title II application for a period of disability and

DIB, alleging a disability onset date of December 11, 2008. (Tr. 205). After his claim was

denied at the agency level, plaintiff requested a hearing before an Administrative Law

Judge ("ALJ"), which was held on April 29, 2015. (Tr. 95–126, 205). Plaintiff appeared in

person and was represented by counsel. Id. The ALJ issued a decision on July 2, 2015,

finding that Millet was not disabled. (Tr. 202–13). Plaintiff requested review of the ALJ's

decision by the Appeals Council, which vacated and remanded the decision for further

consideration. (Tr. 217–19, 278). Upon remand, a second hearing was conducted on May

9, 2017. (Tr. 68, 127–74). Plaintiff appeared in person and, although informed of the right to representation, chose to appear and testify without the assistance of an attorney or other representative. Id. The ALJ issued a decision on November 15, 2017, again finding that Millet was not disabled. (Tr. 65–85). Plaintiff requested review of the second ALJ decision by the Appeals Council, which denied plaintiff's request on July 17, 2018, and the ALJ's decision became the Commissioner's final decision for purposes of this court's review. (Tr. 1–5).

Plaintiff filed his complaint in this court on August 9, 2018. Record Doc. No. 1. Millet timely filed his memorandum of facts and law on February 4, 2019, after being granted an extension of time to do so. Record Doc. Nos. 15, 16. Defendant timely filed her reply memorandum of facts and law on March 12, 2019. Record Doc. No. 19.

II.    STATEMENT OF THE ISSUES ON APPEAL

Because Millet is proceeding pro se, I must construe his allegations broadly. Johnson v. Astrue, 291 F. App'x 582, 585 (5th Cir. 2008) (citing Andrade v. Gonzales, 459 F.3d 538, 543 (5th Cir. 2006)).  Doing so, plaintiff appears to contend that the ALJ made the following errors:

A.    The ALJ erred in finding that the relevant time period for plaintiff's Title II disability insurance benefits claim is from February 2, 2013 to June 30, 2014.

B.    The ALJ erred in her findings as to plaintiff's residual functional capacity, and in relying on the testimony of a vocational expert, who testified that plaintiff could perform the work of a janitor, housekeeping cleaner and/or merchandise marker, and those jobs existed in significant numbers in the national economy.

Record Doc. No. 16 at pp. 2–6.

III.   ALJ'S FINDINGS RELEVANT TO ISSUE ON APPEAL

The ALJ made the following findings relevant to the issue on appeal:

1.   Millet met the insured status requirements of the Act through June 30, 2014.

2.   Plaintiff did not engage in substantial gainful activity during the period from his alleged disability onset date of December 11, 2008, through June 30, 2014.

3.   Through June 30, 2014, he had the following severe impairments: obesity, diabetes mellitus, coronary artery disease, hypertension and depression.

4.   Through June 30, 2014, plaintiff did not have an impairment or combination of impairments that met or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.   Through June 30, 2014, Millet had the residual functional capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for 6 hours per 8-hour workday; sit for 6 hours per 8-hour workday; never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs; and occasionally balance, stoop, kneel, crouch and crawl. Plaintiff must avoid even moderate exposure to hazards in the workplace such as dangerous moving machinery or unprotected heights.   Millet must also avoid concentrated exposure to temperature extremes. Plaintiff is able to engage in occupations that require only occasional direct interaction with the general public and occasional routine workplace changes.

6.   Through June 30, 2014, plaintiff was incapable of performing any past relevant work.

7.   Millet was born on January 18, 1962 and on June 30, 2014, was 52 years old, which is defined as an individual closely approaching advanced age.

8.   Millet has a limited education and is able to communicate in English.

9.   Transferability of job skills is not an issue in this case because plaintiff's past relevant work is unskilled.

10. Through June 30, 2014, considering plaintiff's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Millet could have performed.

11. Millet was not under a disability from December 11, 2008, the alleged disability onset date, through June 30, 2014.

(Tr. 68–84).

## IV.   ANALYSIS

### A.   Standards of Review

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Richard ex rel. Z.N.F. v. Astrue, 480 F. App'x 773, 776 (5th Cir. 2012) (citing Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005)); Stringer v. Astrue, 465 F. App'x 361, 363 (5th Cir. 2012) (citing Waters v. Barnhart, 276 F.3d 716, 716 (5th Cir. 2002)). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Richard ex rel. Z.N.F., 480 F. App'x at 776; Stringer, 465 F. App'x at 363–64; Perez, 415 F.3d at 461. This court may not reweigh the evidence in the record, try the issues de novo or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision. Halterman ex rel. Halterman v. Colvin, 544 F. App'x 358, 360 (5th Cir. 2013) (citing

4

Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000)); Stringer, 465 F. App'x at 364. The

Commissioner, rather than the courts, must resolve conflicts in the evidence. McCaskill v.

Dep't of Health & Human Servs., 640 F. App'x 331, 332–33 (5th Cir. 2016) (citing Perez,

415 F.3d at 461); Luckey v. Astrue, 458 F. App'x 322, 324 (5th Cir. 2011) (citing Selders

v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990)); Newton, 209 F.3d at 452.

The ALJ is entitled to make any finding that is supported by substantial evidence,

regardless whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503

U.S. 91 (1992). Despite this court's limited function, it must scrutinize the record in its

entirety to determine the reasonableness of the decision reached and whether substantial

evidence supports it. Joubert v. Astrue, 287 F. App'x 380, 382 (5th Cir. 2008) (citing Perez,

415 F.3d at 461). Any findings of fact by the Commissioner that are supported by

substantial evidence are conclusive. Ray v. Barnhart, 163 F. App'x 308, 311 (5th Cir. 2006)

(citing Perales, 402 U.S. at 390); Perez, 415 F.3d at 461.

To be considered disabled and eligible for period of disability and disability

insurance benefits, plaintiff must show that she is unable "to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to last for

a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A). The

Commissioner has promulgated regulations that provide procedures for evaluating a claim

and determining disability. 20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901

to 416.998 (2016). The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.[1] Id. §§ 404.1520, 416.920; Alexander v. Astrue, 412 F. App'x 719, 720 (5th Cir. 2011) (citing Audler v. Astrue, 501 F.3d 446, 447 (5th Cir. 2007)); Perez, 415 F.3d at 461. The five-step inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled. Id.

The claimant has the burden of proof under the first four parts of the inquiry. If she successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy that the claimant is capable of performing. When the Commissioner shows that the claimant is capable of

---

[1]The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled. Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence. Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated. If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled. Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy. If the claimant cannot meet the demands, he or she will be found disabled. Id. §§ 404.1520(f)(1), 416.920(f)(1). To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns. When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled. Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 ("Medical-Vocational Guidelines").

engaging in alternative employment, the burden of proof shifts back to the claimant to rebut this finding. Alexander, 412 F. App'x 720–21; Perez, 415 F.3d at 461.

The court weighs four elements of proof when determining whether there is substantial evidence of disability: "'(1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work history.'" Chrisner v. Astrue, 249 F. App'x 354, 356 (5th Cir. 2007) (quoting Wren v. Sullivan, 925 F.2d 123, 126 (5th Cir. 1991)); accord Perez, 415 F.3d at 463.

B.    Factual Background

1.    April 29, 2015 Hearing

At the first hearing, Millet testified that he was 53 years old and had completed the 11th grade, but did not earn a General Education Diploma ("GED"). (Tr. 101). He testified that he had received no other training after the 11th grade. Id. Millet testified that as of the date of the hearing, he was not working and had been laid off from his job on December 11, 2008, which consisted entirely of stripping and waxing floors, or "floor maintenance," at the airport. (Tr. 101–03).

Plaintiff confirmed that he did some of the same floor maintenance for Jani-Care Commercial Cleaning in 2013, but "didn't do [the] job long, [be]cause [he] couldn't perform the work." (Tr. 102). Millet testified that he worked at Jani-Care for only "a month." (Tr. 102–03). Millet confirmed that he worked at River Bend Truck Stop in 2014,

where he was doing "the same thing, doing the floors, sweeping." (Tr. 103). He testified that he considers no jobs available that have lighter work because he "can't hold stuff in [his] hands."

As to the medical treatment of his physical condition, Millet testified that he saw Dr. Jose Cusco at Ochsner on April 14, 2015, and before Dr. Cusco he saw several other doctors, Dr. Davis and Dr. Spiegel, at LSU Interim Hospital, sometime in April 2014. (Tr. 100, 104–06). He testified that there was a gap in his treatment because he was not able to afford the doctor visits. (Tr. 106). Millet testified that he has been diagnosed with diabetes, high blood pressure, arthritis, bad knees and lower back pain. (Tr. 106). He testified that he went into the emergency room the Monday after the Super Bowl in 2014. (Tr. 106).

As to his mental health, Millet testified that he tries to go to the doctor, but the doctor is never there. (Tr. 106–07). When questioned about his drug use, he testified that he stopped using drugs years ago but his medication interferes with his drug testing. (Tr. 107). The ALJ identified a record of a positive drug screen showing cocaine use in February 2014, but Millet testified that the record was incorrect. (Tr. 107–08). The ALJ asked him whether it was correct that he was counseled extensively on the dangers of continued use of alcohol and cocaine, and Millet again testified that the record was incorrect. (Tr. 108). Millet later testified that he never used drugs, but was around drugs. (Tr. 112). However, he then testified that he "did drugs in the past" when he was 32 years old, but stopped using drugs sometime in his 30s. (Tr. 113–14). When asked about the last

time he had treatment for depression, Millet responded that he had treatment for depression

on April 14, 2015. (Tr. 109). He testified that he is getting treatment for depression at River

Parish Mental Health in LaPlace, Louisiana. (Tr. 110). Millet testified that he was not

treated for depression from April 2014 to April 2015. (Tr. 110).

When asked about his living situation, Millet testified that he lives alone but has

family come over and "do stuff for" him. (Tr. 108). He testified that his family and friends,

especially his sister, help him pay for medications and other needs. (Tr. 108–09). Millet

testified that during a typical day, he gets up in the morning and prays, then "if [he] can"

he watches television and paces up and down the floor, because he is "so depressed." (Tr.

109). Millet stated that he has been suffering from depression since 2013, and thinks that

his depression was brought on by not working. (Tr. 112). He testified that his inability to

work "drove [his] wife away . . . [be]cause [he] was always . . . angry." (Tr. 112). Millet

stated that his first wife was killed in a car accident in 2006. (Tr. 112). He testified that he

began drinking heavily after his first wife was killed, but stopped around 2008. (Tr.

113–14).

Millet testified that he is unable to work because he is "unable to think; [has a] lack

of memory . . . [and] pain . . . [in his] [l]ower back, . . . knees, and [his] left hand." (Tr.

110). He further testified that he believes he cannot work because he forgets things; for

example, if he was told something and then asked about it 45 minutes later, he would have

to think about it to remember what he was told. (Tr. 119). He stated that he used to

exercise, but now cannot because of his pain. (Tr. 111). He testified that he cannot "do the things [he] used to do, [like] play ball . . . [or] run with the grandkids." (Tr. 111). He said that his weight has been "dropping," and at the time of the hearing he weighed 253 pounds. (Tr. 111). He testified that he has been placed on a special diet, which consists of low carbs, salads and no starch, among other dietary restrictions. (Tr. 111). Millet testified that he takes pills for his diabetes, and medication for his back pain. (Tr. 111). He stated that the medication for his back helps "a little bit," (Tr. 111), and that he took hydrocodone from 2008 to 2013. (Tr. 115).

Millet testified that he cannot get out, walk or cut grass "like [he] want[s] to" because of his impairments. (Tr. 115) He said that he can walk only about "half-a-block" due to the pain in his knees and lower back. (Tr. 115). Millet testified that Dr. Spiegel told him that he had to elevate his legs. (Tr. 116). He stated that he has problems climbing, stooping, pushing, pulling and five-finger manipulation, such as writing, typing, and picking up small objects with his fingers. (Tr. 117). He also said that he has problems getting along with family and friends because they say he is "grumpy." (Tr. 118). Millet testified that he does not deal with the public much, and the only time he goes out is to go to church, which he said he attends every Sunday for about thirty minutes. (Tr. 118–19). Millet testified that it "doesn't bother" him to be around people. (Tr. 119).

2.    May 9, 2017 Hearing

At the second hearing, Millet confirmed that he submitted additional records, including a functional capacity evaluation done by Dr. Roxy Hill, whom he identified as his primary care physician at Teche Action Clinic. (Tr. 133). Millet also confirmed that he submitted a letter from Performance Medical, Inc., detailing an order from a doctor for Millet to have tests, which he testified that he had done. (Tr. 133–34). The ALJ stated that she did not have records of the tests.  (Tr. 134). When questioned, Millet confirmed that a nerve conduction test was performed by Dr. Todd at Advanced Pain Management. (Tr. 134). The ALJ stated that she also did not have the records from Dr. Todd's treatment. (Tr. 134). The ALJ stated that she was going to order records from Dr. Todd and Performance Medical, Inc. (Tr. 135). Millet also confirmed that the records that the ALJ had from Dr. Tab were from his foot doctor for his diabetic foot. (Tr. 135). Millet confirmed that the records that the ALJ had received from Ochsner from Dr. Zola and Dr. N'Dandu were his cardiology treatment records. (Tr. 136).  Plaintiff confirmed that he has stenosis in his legs. (Tr. 137). The ALJ also asked about records from Ostrick and Moncada Vision Care, which indicate that Millet has glaucoma and cataracts. (Tr. 137). The ALJ stated that she did not have those records, and would order them. (Tr. 137–38).

Millet testified that his then current address was 117 East Spirit Street, Reserve, Louisiana 70084, and that he had lived there alone since 2009. (Tr. 143). He stated that he has no minor children. (Tr. 144). Millet testified that the last time he worked was in 2008,

when he was doing floor maintenance (stripping, buffing and waxing floors) at the New

Orleans airport. (Tr. 144). He said that he had been in that position from 1999 to 2008, and

he stopped doing the work because the company lost the contract at the airport. (Tr. 144).

Millet stated that he has looked for other work, specifically at a truck stop doing janitorial

work for two to three hours a day. (Tr. 144–45). He confirmed that he worked part-time at

River Bend Truck Stop in 2014 and Jani-Care Commercial Cleaning in 2013. (Tr. 147).

He testified that he was having problems with his hands, back, legs and feet. (Tr. 145).

Millet elaborated that if he tries to hold a glass of water for too long, it falls out of his

hands. (Tr. 145).

Millet testified that his maternal aunt helps him with utility bills and other things

since he is not working, he receives food stamps and has started to get Medicaid. (Tr.

145–46). He said that he owns the home he lives in. (Tr. 146). Millet testified that he has

not driven a car since 2008, because his license was suspended due to speeding tickets. (Tr.

146). Millet stated that his car is still in his driveway and that he has to get rides to go to

doctors' visits and so on, but for "anything personal," his aunt will bring what he needs to

him. (Tr. 146–47). Millet testified that his sister is a nurse and she also helps him. (Tr. 155).

As to what he believes prevents him from working, Millet testified that he has

neuropathy[2] in his legs, from his thighs to his feet, and it has recently started in his hand.

---

[2] Neuropathy is "a functional disturbance or pathological change in the peripheral nervous
system, sometimes limited to noninflammatory lesions as opposed to those of neuritis; the etiology may
be known or unknown. Known etiologies include complications of other diseases (e.g. diabetic
n[europathy], amyloid n[europathy], porphyric n[europathy]) or of toxic states (e.g. arsenic n[europathy],

(Tr. 148–49, 150–51). He testified that when he holds anything in his hand he feels a burning sensation, like needles. (Tr. 149). He stated that his legs feel worse than his hands. (Tr. 151). Millet testified that he has had neuropathy in his legs for the entire relevant period, but was not going to the doctor at the time of the last hearing because he did not have insurance. (Tr. 151). Millet said that sometimes he cannot open a twist cap on a soda bottle and has to use pliers. (Tr. 149). He testified that he takes Gabapentin[3] for the pain, which "helps . . . a little bit," (Tr. 149), and that the medication he takes makes him drowsy and affects his vision. (Tr. 150). He testified that he takes Metformin[4] once a day for his diabetes. (Tr. 150). Millet also testified that he has been diagnosed with glaucoma, which he is treating with eye drops every night, and his eye doctor has recently noticed cataracts. (Tr. 151–52). He testified that he has noticed worsening vision, which requires him to wear glasses. (Tr. 152). Millet stated that the glasses are not working because he has developed cataracts. (Tr. 152–53).

---

isoniazaid n[europathy], lead n[europathy], nitrofurantoin n[europathy]) Neuropathies affecting a specific nerve may be named for the nerve (e.g. femoral n[europathy]). The terms mononeuropathy and polyneuropathy may be used to denote whether one nerve or several are involved. Encephalopathy and myelopathy are corresponding terms referring to the brain and spinal cord, respectively." Dorland's Illustrated Medical Dictionary 1212 (29th ed. 2000) (hereinafter "Dorland's").

[3] Gabapentin "is an anti-epilepetic drug . . . [that] affects chemicals and nerves in the body that are involved in the cause of seizures and some types of pain." GABAPENTIN, Drugs.com, https://www.drugs.com/gabapentin.html (last visited Sept. 23, 2019).

[4] Metformin "is an oral diabetes medicine that helps control blood sugar levels. Metformin is used together with diet and exercise to improve blood sugar in adults with type 2 diabetes mellitus." METFORMIN, Drugs.com, https://www.drugs.com/metformin.html (last visited Sept. 23, 2019).

As to the problems with his heart, Millet testified that his doctor told him that his heartbeat was slow and gave him pills to increase his heartbeat. (Tr. 153). He stated that the doctor found no blockage in his heart. (Tr. 162–63). He testified that he went to Dr. Todd for a problem with his legs other than neuropathy; specifically, the blood was not flowing well in his legs. (Tr. 153–54). Millet stated that he went to the doctor for this issue because his legs were hurting, "like tight pain," (Tr. 154), and the doctor said that pain was caused by the blood flow issue. (Tr. 154–55). He testified that he has recently started medication to treat that issue, but the doctors have discussed amputating his legs if things do not change. (Tr. 155). Millet stated that the doctors decided that surgery on his veins was not possible. (Tr. 155–56).

As to the problems with his back, Millet testified that he has pain in his lower back that moves down to his hip. (Tr. 156). He testified that sometimes he cannot get out of bed and he wets himself a few times a week, so he has to wear adult diapers in case that happens. (Tr. 156–57). Millet stated that he takes Ibuprofen for his back pain. (Tr. 157). He testified that he weighed 269 pounds at the time of the hearing. (Tr. 158). Millet stated that at the time of the hearing he was on a diet of only broccoli and fish and no fried foods. (Tr. 158).

As to his activities during a typical day, Millet testified that he wakes up, goes to the bathroom, tries to keep active in his house and walks a little outside and on his porch. (Tr. 158). He testified that he cannot walk or do activities like he used to due to the pain in his

14

legs. (Tr. 158–59). Millet stated that he can walk for about 30 minutes a day three times a day. (Tr. 159). He testified that he can stand for about 20 to 30 minutes at a time, and then his legs start to bother him and he needs to elevate his legs. (Tr. 159). Millet stated that he cannot sit too long, and if he sits on his sofa to watch television he has to put a pillow behind his back. (Tr. 159–60). Millet testified that he will often sleep during the day because of his medication. (Tr. 160). He stated that he goes to church every Sunday. (Tr. 160). Millet testified that he plays an instrument and that he used to DJ but he cannot do it anymore because he cannot lift anything heavy. (Tr. 163). He testified that he used to play drums about 15 years ago, but he does not anymore. (Tr. 164). He also testified that he works the sound board at his church every Sunday. (Tr. 164).

Asked about the issue with cocaine, Millet testified that he "went and took too much medicine . . . [that] had a drug in it." (Tr. 160). He stated that he "told the man about that and [he] went to the drug test and . . . passed it." (Tr. 160). Millet testified that he believes that the drug test when he tested positive for cocaine was a false reading due to his medication. (Tr. 161). He testified that he has no problems with drugs or alcohol and, while he used to drink heavily, he now only occasionally has a glass of wine. (Tr. 161).

Millet testified that he has difficulty reading and that sometimes he forgets how to spell his name and what his Social Security number is. (Tr. 164–65).

C.    Vocational Expert Testimony

1.    April 29, 2015 Hearing

15

Heyward X. Johnson II, a vocational expert, testified at the first hearing. (Tr. 120). The vocational expert testified that floor maintenance is classified as DOT number 381.687-018, medium in exertion, with an SVP of 2, which is the extent of plaintiff's work history. (Tr. 121).

The vocational expert then testified that plaintiff did not possess any readily transferable skills. (Tr. 122). The ALJ then posed a hypothetical, assuming a hypothetical individual with the same vocational factors as plaintiff, including the same age, education and past work experience; with the residual functional capacity for light work; with no climbing ladders, ropes or scaffolds, occasional climbing ramps and stairs, occasional stooping, kneeling, crouching, and crawling; with the individual avoiding work with dangerous or hazardous machinery or heights; and no concentrated exposure to temperature extremes in a job with routine workplace changes. (Tr. 122). The vocational expert testified that the hypothetical individual could not perform plaintiff's past work. (Tr. 122).

The vocational expert testified, however, that the hypothetical individual could perform several other available positions, including: (1) marker, with a DOT number of 209.587-034, SVP of 2, classified as light work, with 1,782,800 national positions and 22,130 state positions; (2) sorter, with a DOT number of 526.687-010, SVP of 1, classified as light work, with 434,170 national positions and 6,330 state positions; (3) a cashier, with a DOT number of 211.462-010, SVP of 2, classified as light work, with 3,314,870 national positions and 65,100 state positions; and (4) cleaner, with a DOT number of 323.687-014,

16

with an SVP of 2, classified as light work, with 877,980 national positions and 15,600 state positions. (Tr. 123). When the ALJ adjusted the hypothetical to include only occasional direct interaction with the public, the vocational expert testified that the suggested modification would eliminate the cashier job altogether. (Tr. 123).

The ALJ then asked the vocational expert a modified hypothetical, assuming that the person would be further limited to occasional handling, grasping and feeling bilaterally. (Tr. 123). The vocational expert testified that the additional modification would eliminate all of the jobs and he could not find work for the hypothetical individual. (Tr. 124). The ALJ then asked whether there were any jobs available that allowed the hypothetical individual to take two rest breaks for thirty minutes apiece, outside of normal breaks and lunch. (Tr. 124). The vocational expert testified that no such jobs existed. The vocational expert was then asked by plaintiff's attorney if the jobs available in the first and second hypotheticals would still be available if the hypothetical individual was required to elevate his legs for roughly two hours in an eight-hour workday, and the vocational expert confirmed that they would not. (Tr. 125).

2.   May 9, 2017 Hearing

A different vocational expert, Thomas Meunier, Jr., testified at the May 9, 2017 hearing. (Tr. 167–69). The vocational expert testified that Millet's past work as a floor technician is basic janitorial work, which is classified as medium, unskilled work, with SVP of 2 and a DOT number of 381.687-018. (Tr. 167).

The ALJ then posed a hypothetical, asking the vocational expert about a hypothetical individual who shares Millet's age, education, and work experience; would be able occasionally to lift and carry 20 pounds; frequently lift and carry ten pounds; stand and walk for six hours in an eight-hour workday and sit for six hours in an eight-hour workday; not climb ladders, ropes or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; must avoid even moderate exposure to hazards in the workplace, such as moving machinery or unprotected heights; must avoid concentrated exposure to temperature extremes; and engage only in occasional direct interaction with the public and occasional routine workplace changes. (Tr. 167–68). The vocational expert confirmed that, with those limitations, the hypothetical individual could not return to Millet's past work. (Tr. 167–68).

The vocational expert confirmed, however, that other jobs existed that fit those limitations. (Tr. 168). Those jobs were: (1) light janitorial work, DOT number 381.687-030, light, unskilled work with SVP of 2, with 121,769 national positions; (2) housekeeping cleaner, DOT number 323.687-014, light unskilled work with an SVP of 2, with 441,298 national positions; and (3) merchandise marker, DOT number 209.587-034, light work with an SVP of 2, with 248,333 national positions. (Tr. 168–69).

The ALJ then modified the hypothetical to assume that the hypothetical individual had good days and bad days, such that he would likely miss fifteen percent of work time when he cannot make it to work, has to leave work early or take excessive breaks. (Tr.

169). The vocational expert confirmed that with that modification, the hypothetical individual would not be able to work in any capacity. (Tr. 169).

D.    Medical Evidence

I have reviewed the medical records in evidence and the ALJ's summary of the evidence in both of her decisions. (Tr. 77–83, 209–212). I find the ALJ's summary of the medical evidence substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

E.    Plaintiff's Appeal

1.    The ALJ properly found that the relevant time period for plaintiff's Title II disability claim is from February 2, 2013 to June 30, 2014.

In his first assignment of error, plaintiff argues that he was improperly denied benefits on July 2, 2015. Record Doc. No. 16 at p. 4.  However, the ALJ expressly noted in her decision that while plaintiff's alleged disability onset date was December 11, 2008, he had filed a previous application for DIB, which was denied by a different ALJ on February 1, 2013, and was not appealed to the Appeals Council. (Tr. 69, 175–88, 334). Because plaintiff chose not to appeal, that February 1, 2013 decision became the final, binding decision of the Commissioner pursuant to 20 C.F.R. § 404.905. This court is without jurisdiction to review that decision or plaintiff's claims existing before that date. See Califano v. Sanders, 430 U.S. 99 107–09 (1977); Muse v. Sullivan, 925 F.2d 785, 787 n. 1 (5th Cir. 1991); Gomez v. Barnhart, 184 Fed. Appx. 436, 437 n. 1 (5th Cir. 2006). "Jurisdiction does exist, however, when a plaintiff raises a colorable constitutional

claim." <u>Riecke</u>, 184 F. App'x at 456 (citing <u>Sanders</u>, 430 U.S. at 109; <u>Brandyburg</u>, 959 F.2d at 562). "A colorable constitutional claim must be based on more than mere conclusory allegations of due process violations. . . . [A] colorable constitutional claim [is] one that is 'not wholly insubstantial, immaterial, or frivolous.'" <u>Ramirez v. Colvin</u>, 2016 WL 94145, at *3 (W.D. Tex. Jan. 7, 2016) (citing <u>Robertson v. Bowen</u>, 803 F.2d 808, 810 (5th Cir. 1986)) (quoting <u>Klemm v. Astrue</u>, 543 F.3d 1139, 1144 (9th Cir. 2008)).

Plaintiff's complaint that the Commissioner erred in previously denying his request for DIB raises no colorable constitutional claim that his due process rights were violated because he never had a meaningful opportunity to be heard.  On the contrary, the Commissioner advised Millet that he could request reconsideration of the ALJ's decision, but plaintiff did not do so. (Tr. 175–88).  Thus, the ALJ properly noted that the earliest possible date that plaintiff could be found disabled was February 2, 2013, the day after the previous ALJ's decision. (Tr. 69).

The ALJ also found that plaintiff last met the insured status requirements for Title II DIB through June 30, 2014. (Tr. 71, 350).  The Fifth Circuit has recognized that the Social Security Act provides for the payment of DIB to persons who have contributed to the program, and who suffer from a physical or mental disability. <u>Loza v. Apfel</u>, 219 F.3d 378, 390 (5th Cir. 2000). Millet last met these requirements on June 30, 2014. "Thus, to prove that [he] is entitled to disability benefits, [plaintiff] must not only prove that [he]

is disabled, but that [he] became <u>disabled prior to the expiration of her insured status</u>."

<u>Anthony v. Sullivan</u>, 954 F.2d 289, 295 (5th Cir. 1992) (citing 42 U.S.C. § 423(a), (c))

(emphasis added); <u>accord</u> <u>Brunson v. Astrue</u>, 387 F. App'x 459, 460 (5th Cir. 2010);

<u>Brown v. Astrue</u>, 344 F. App'x 16, 19 (5th Cir. 2009) (citing <u>Ware v. Schweiker</u>, 651

F.2d 408, 411 (5th Cir. 1981)); <u>Joubert v. Astrue</u>, 287 F. App'x 380, 382 (5th Cir. 2008);

20 C.F.R. §§ 404.315, 404.320, 404.131(a).  "Evidence showing a degeneration of a

claimant's condition after the expiration of his Title II insured status is not relevant to the

Commissioner's Title II disability analysis." <u>McLendon v. Barnhart</u>, 184 F. App'x 430,

432 (5th Cir. 2006) (citing <u>Torres v. Shalala</u>, 48 F.3d 887, 894 n.12 (5th Cir. 1995));

<u>accord</u> <u>Dominguez v. Astrue</u>, 286 F. App'x 182, 185 (5th Cir. 2005).  A claimant who

becomes disabled <u>after</u> the expiration of his insured status is not entitled to DIB.  <u>Id.</u> at

186; <u>Cook v. Astrue</u>, 2008 WL 4454044, at *6 (N.D. Tex. Oct. 2, 2008) (citing 42 U.S.C.

§§ 416(i)(3), 423c; <u>Oldham v. Schweiker</u>, 660 F.2d 1078, 1080 (5th Cir. 1981)).  Millet

therefore must show that he was disabled <u>as of</u> June 30, 2014, the date that he was last

insured for DIB.

   Accordingly, the ALJ properly found that the relevant time period for plaintiff's

Title II disability claim is from February 2, 2013, the day after the previous ALJ decision,

to June 30, 2014, the date that Millet last met the insured status requirements of the Social

Security Act.  Plaintiff's first assignment of error lacks merit.

2.    The ALJ properly evaluated the medical evidence in determining plaintiff's residual functional capacity and properly relied on the testimony of a vocational expert.

Before addressing Steps Four or Five of the sequential evaluation, the ALJ must determine the claimant's residual functional capacity, which is the person's "ability to do physical and mental tasks on a sustained basis despite limitations from h[is] impairments. In determining residual functional capacity, the Commissioner must consider all of a claimant's impairments, including those that are not severe." Giles v. Astrue, 433 F. App'x 241, 245 (5th Cir. 2011) (citing 20 C.F.R. §§ 404.1520(e), 404.1545). Residual functional capacity "is a determination of the most the claimant can still do despite his physical and mental limitations and is based on all relevant evidence." Perez, 415 F.3d at 462 (citing 20 C.F.R. § 404.1545(a)(1)). The ALJ is solely responsible for assessing the medical evidence and determining the claimant's residual functional capacity. Taylor v. Astrue, 706 F.3d 600, 602–03 (5th Cir. 2012).

"It is the responsibility of the ALJ to interpret 'the medical evidence to determine [a claimant's] capacity for work.'" Fontenot v. Colvin, 661 F. App'x 274, 277 (5th Cir. 2016) (quoting Taylor, 706 F.3d at 603) (brackets in original). "The ALJ 'is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly.'" Ramirez, 606 F. App'x at 779 (quoting Scott v. Heckler, 770 F.2d 482, 485 (5th Cir. 1985)); accord Yates v. Colvin, 606 F. App'x 225, 229 (5th Cir. 2015) (citing Greenspan v. Shalala, 38 F.3d 232, 237 (5th Cir. 1994)). When the ALJ has relied

on reports from examining and reviewing physicians and adequately dealt with any dispute between them, his residual functional capacity determination "must be upheld under the substantial evidence standard, because reliance on the analysis of these doctors is more than a mere scintilla, and any evaluation of the accuracy of the analysis is beyond the scope of this court's review." Fontenot, 661 F. App'x at 277 (citing Taylor, 706 F.3d at 603; Perez, 415 F.3d at 461; Moore v. Sullivan, 919 F.2d 901, 905 (5th Cir. 1990)).

Based on plaintiff's testimony, objective medical evidence and supported medical opinions, the ALJ found that Millet has the residual functional capacity to perform light work,[5] with the following extertional, postural and environmental limitations: lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for 6 hours per 8-hour workday; never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs; occasionally balance, stoop, kneel, crouch and crawl; avoid even moderate exposure to hazards in the workplace such as dangerous moving machinery or unprotected heights and concentrated exposure to temperature extremes; have only occasional direct interaction with the general public and occasional routine workplace changes. (Tr. 75–83). The ALJ found that plaintiff had severe impairments of obesity, diabetes mellitus, coronary artery disease, hypertension and depression, and that plaintiff's subjective allegations were not entirely consistent with the medical evidence of record. Id. At Step Four, the ALJ determined that plaintiff was unable to perform his past relevant work as a floor technician.

---

[5] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. § 404.1567(b).

(Tr. 83). At Step Five, however, the ALJ found that plaintiff could perform other available jobs that exist in significant numbers in the national economy. (Tr. 83–84). These findings are supported by substantial evidence.

Millet argues that the ALJ erred in her residual functional capacity finding and in finding that plaintiff could perform the jobs that the vocational expert identified; namely, janitor, housekeeping cleaner and merchandise marker. Record Doc. No. 16 at pp. 2–3. As to the ALJ's finding that plaintiff could perform work as a janitor, plaintiff argues that he is "not physically able to perform this job because [his] hands and feet can physically prevent me to do a full day['s] work. [He has] problem[s] holding anything for more than 2 minute[s] before it falls out [of his] hands, and [he] can't stand too long on [his] feet." As to the ALJ's finding that plaintiff could perform work as a housekeeping cleaner, plaintiff argues that he is "unable to perform this job . . . because of the situation . . . in cleaning with my hands and standing for a long period of time. This [job] is a day to day job that [makes him nervous] because [he] want[s to] be able to give 100% toward [his] job." As to the ALJ's finding that plaintiff could perform work as a merchandise marker, plaintiff argues that he is "not able to perform this job because [he] would have to bend or stoop to mark the merchandise and because of [his] back and leg problem[s] . . . ." Id.

As to plaintiff's complaints about his hands, the ALJ found based on substantial evidence that "the treatment notes during the relevant adjudicative period [do not] indicate that [plaintiff] was complaining of numbness or tingling in his hands, and there are no

objective examination findings during this time to indicate that [he] had any functional limitations pertaining to his hands.  In fact, at one point during the relevant adjudicative period [March 2013], it was noted that [Millet] reported that he had been doing work with his hands." (Tr. 77, 484).  The medical evidence reflects that plaintiff had a physical examination of his hands, which revealed that he had a lesion of about 0.03 centimeters on the palm of his left hand that was round and hardened, but palpation to the skin revealed no abnormality and plaintiff did not complain of pain. (Tr. 485).

As to plaintiff's other physical impairments, it is clear as an initial matter that the ALJ properly considered plaintiff's physical impairment of obesity and its effects when assessing his residual functional capacity, as required by Social Security Regulation 02-1p. The regulation requires that an ALJ consider the fact that "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately."  SSR 02-1p.  The ALJ properly considered plaintiff's obesity in evaluating the competent medical evidence and based her conclusions on substantial evidence, all as demonstrated below.

On February 27, 2013, Millet "was found to have an obese body mass index . . . of 40.88 on physical examination." (Tr. 77, 482–83). Nevertheless, the ALJ observed that plaintiff "was consistently found to have normal gait as well as normal tone, bulk, and strength" from February to September 2013. (Tr. 77–78, 458, 463, 469, 474, 479). "The claimant's diabetes was stated to be without mention of complication." (Tr. 77, 482–83).

On March 24, 2013, plaintiff's body mass index had slightly increased to 41.5. (Tr. 478–80). However, he still exhibited normal gait, normal range of motion of both lower extremities, and normal tone, bulk and strength throughout. (Tr. 479). On April 24, 2013, plaintiff was again found to have a normal gait, normal range of motion of the bilateral lower extremities, and normal tone, bulk and strength throughout. (Tr. 474). In July 2013, plaintiff's body mass index had increased to 42.29. (Tr. 468). The treatment notes indicate that plaintiff was complaining of tingling, burning and numbness in his legs, but the doctor found that he had a normal gait, his lower extremities were normal, and he exhibited normal range of motion, tone, bulk and strength. (Tr. 469). Plaintiff rated his pain in his legs as a "3-4, tolerable." While the examiner noted that plaintiff's blood pressure was high, Millet admitted that he had been out of his blood pressure medication for the past two weeks and had not followed his prescribed diet. (Tr. 466).

In July 2013, plaintiff complained of neuropathy in his lower extremities, but the record reflects that his symptoms improved with Mobic. (Tr. 77, 458, 463, 466, 468, 469, 482). In August 2013, plaintiff reported improved compliance with medication, diet and exercise and corresponding improvement of his blood sugar, hypertension and leg pain. (Tr. 462). His body mass index had also decreased. Id. Plaintiff was found to have continued diminished sensation in his lower right extremity, but the doctor observed that his gait was normal, he had normal range of motion of his lower extremities, and normal tone, bulk and strength. (Tr. 463). He continued to exhibit normal gait on examination

in September 2013, his body mass index had decreased again, and his diabetes was again noted as without complication.  (Tr. 458)

In February 2014, plaintiff was admitted to the LSU Interim Hospital, and was complaining of "generalized body aches/pain, intermittent chest pain" and increased pain in his right lower extremity. (Tr. 550). Treatment notes indicate that Millet stated that he "started to notice [his right lower extremity] began to hurt [about one] month" before the visit. Id. The treating physician noted that he was "ambulatory with [a] steady gait." Id. According to the treatment notes, Millet was more concerned with his chest pain, which was attributed to a hypertension emergency that was treated in the hospital. (Tr. 550–51, 557).  Plaintiff tested positive for cocaine. (Tr. 550).  He also admitted that he was not taking his blood pressure medications properly, and in fact reported that he had failed to comply with his diabetes and hypertension medications for six months before his admission.  (Tr. 588, 628).  During this admission to the LSU Interim Hospital, plaintiff received medication and when discharged, his blood pressure was "much better controlled," with no evidence of end organ damage. (Tr. 557). Transthoracic[6]

---

[6] Transthoracic is defined as "performed through the wall of the thorax [chest: the part of the body between the neck and the thoracic diaphram, encased by the ribs], or through the thoracic cavity." Dorland's at 1834, 1867.

echocardiography[7] showed good left ventricular[8] function and a cardiac catheterization[9] showed only mild non-obstructive coronary artery disease. (Tr. 556). The treatment notes also indicate that plaintiff was independent with his activities of daily living and was working odd jobs. (Tr. 589).

On March 11, 2014, soon after his admission to the hospital, plaintiff reported that he was feeling okay, even though he had not taken his blood pressure medication in more than a week. (Tr. 619). He reported some pain in his right leg, but said that extra strength Tylenol provided relief. (Tr. 621). On March 18, 2014, Millet reported that he was compliant with his medications, and was correspondingly doing very well. (Tr. 628). He denied any chest pain, shortness of breath, palpitations, or syncope,[10] and stated that his blood glucose levels had improved considerably. Id. The treatment notes indicate that on examination he had normal range of motion, his hypertension was controlled and was

---

[7] Echochardiagraphy is defined as "a method of graphically recording the position and motion of the heart walls or the internal structures of the heart and neighboring tissue by the echo obtained from beams of ultrasonic waves directed through the chest wall." Dorland's at 564.

[8] Ventricular is defined as "pertaining to a ventricle [a small, normal cavity in an organ such as the heart or brain]." Dorland's at 1955.

[9] Cardiac catheterization is "the passage of a small catheter through a vein in the arm or leg or the neck and into the heart, permitting the securing of blood samples, determination of intracardiac pressure, detection of cardiac anomalies, planning of operative approaches, and determination, implementation, or evaluation of appropriate therapy." Dorland's at 300.

[10] Syncope is "a temporary suspension of consciousness due to generalized cerebral ischemia; a faint or swoon." Dorland's at 1747.

told to stay on his medications and to maintain his diet and exercise regimen as "weight loss [was] imperative." (Tr. 629).

On May 20, 2014, plaintiff reported that he was feeling well, and had been compliant with his medications, although he did not take his blood pressure medication that morning. (Tr. 776). He was started on Gabapentin for his neuropathy pain, which he described as "some bilateral tingling/burning . . . on occasion to his feet/toes." (Tr. 776–80) (emphasis added). In June 2014, almost a month before the date last insured, plaintiff's diabetes was again noted to be "without mention of complication." (Tr. 781). Millet reported that he had decreased his portion sizes, lost weight and exercised sometimes. (Tr. 782).

Based on the above substantial medical evidence, the ALJ concluded that "it certainly has not been substantiated that [Millet] would have been unable to perform work within the restrictive parameters of the exertional, postural, and environmental limitations" in the residual functional capacity assessment during the relevant time period. (Tr. 79).

As to plaintiff's mental impairment, the ALJ noted that the medical evidence documented normal findings, and that plaintiff "denied any psychiatric symptoms on review of systems at medical encounters in February, March, April, July, August and September 2013." (Tr. 79, 458, 463, 468, 474, 479, and 481). The ALJ also noted that "the treatment notes corresponding to each of these encounters also document that

[Millet] exhibited appropriate mood and affect on examination." Id.  In September 2013, plaintiff reported that he was experiencing mood, memory and concentration issues. (Tr. 79, 537).  These records indicate that plaintiff had never received any psychiatric treatment before this date. Id.  Millet reported that he was not feeling hopeless, despite his other symptoms, and that he had occasionally been working as a disc jockey. (Tr. 537).  On examination, plaintiff was found to exhibit an anxious, irritable and depressed mood with a constricted affect. (Tr. 538).  However, plaintiff was found to have an intact memory and though he was found to have limited concentration, the treatment records reflect that he was alert with normal thought processes. Id.  Additionally, subsequent treatment notes reflect that he exhibited fair concentration.  (Tr. 541, 543).  The treating physician prescribed daily Celexa[11] for his symptoms. (Tr. 538). Plaintiff was "attributed a global assessment of functioning ("GAF") score of 51, which is indicative of moderate difficulty in social or occupational functioning," but the ALJ afforded the score little weight, since it "only represent[s] an individual's clinician's experience and take[s] into account factors that are not appropriate for determination of disability under [Social Security Administration] rules – such as an individual's employment, housing, or familial status." (Tr. 80, 538).

---

[11] Celexa (citalopram) "is an antidepressant in a group of drugs called selective serotonin reputake inhibitors." CELEXA, Drugs.com, https://www.drugs.com/celexa.html (last visited Sept. 23, 2019).

To the extent that plaintiff argues that the ALJ should have assessed more severe limitations in his work-related mental abilities, based on his assessment of a GAF score of 51, which denotes moderate symptoms or difficulties in functioning,[12] it is entirely the ALJ's province to resolve such conflicts. Additionally, both the American Psychiatric Association and the Commissioner have recently determined that GAF scores are not especially helpful in either medical or disability decision-making. The American Psychiatric Association has deleted the GAF analysis from its revised <u>Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition: DSM-5</u> (5th ed. 2013), and the Commissioner has issued internal guidance for its adjudicators regarding the limited usefulness of GAF scores.

> GAF scores have been deemed unreliable. "It was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity . . . and questionable psychometrics in routine practice." To clarify the appropriate reliance on GAF scores, the Social Security Administration ("SSA") released an Administrative Memorandum (identification number AM-13066, effective date July 22, 2013)[13] that "provides guidance to all State and Federal adjudicators (including administrative law judges) on how to consider Global Assessment

---

[12] A GAF of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers). A GAF of 41-50 denotes "[s]erious symptoms (e.g., suicidal ideation, severe obsessive rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." <u>Castillo v. Colvin</u>, 2014 WL 897798, at *5 n.2 (S.D. Tex. Mar. 6, 2014) (quoting DSM-IV-TR at 34).

[13] A copy of the Commissioner's Administrative Message (not Memorandum) AM-13066 is available at pp. 18-24 of the New York State Bar Association's seminar materials for "Moving Towards Civil Gideon," http://www.nysba.org/WorkArea/DownloadAsset.aspx?id=51489 ( last visited Mar. 12, 2015).

Functioning (GAF) ratings when assessing disability claims involving mental disorders." (ECF No. 11-2 at 6.) The Administrative Memorandum emphasizes that "GAF ratings are not standardized," explaining that "GAF is neither standardized nor based on normative data. . . . This limits direct comparability of GAF scores assigned by different evaluators. . . ." Id. at 3. The Administrative Memorandum continues:

> Although the GAF rating is numerical, the actual number assigned can be misleading because the score does not quantify differences in function between people.  For example, a GAF score of 75 does not mean a person is functioning 10 units better than a person with a score of 65, nor does a GAF of 40 indicate a person is functioning half as well as a person with a score of 80. Id.  Additionally, it states that "GAF ratings assigned by different clinicians are inconsistent" and "adjudicators cannot draw reliable inferences from the difference in GAF ratings assigned by different clinicians or from a single GAF score in isolation." Id.

Hall v. Colvin, 18 F. Supp. 3d 144, 153 (D.R.I. 2014) (quoting DSM-5).

AM-13066 provides that a GAF rating from an acceptable medical source is a medical opinion that should be considered and weighed with all of the relevant evidence.

> However, as with other opinion evidence, a GAF needs supporting evidence to be given much weight.  By itself, the GAF cannot be used to "raise" or "lower" someone's level of function.  The GAF is only a snapshot opinion about the level of functioning. . . . Unless the clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis.

AM-13066, ¶ E, at p. 22 of New York State Bar Association's "Moving Towards Civil Gideon," http://www.nysba.org/WorkArea/DownloadAsset.aspx?id=51489.

> Indeed, the previous version of the DSM specifically provided that the GAF assessment is made based on either the individual's symptoms or her functional impairments, whichever is lower.  DSM-IV-TR at 32-33 (emphasis added).  The Commissioner has determined the GAF scale "does

> not have a direct correlation to the severity requirements in [the Social
> Security Administration's] mental disorders listings." 65 Fed. Reg. 50,746,
> 50,765-766 (Aug. 21, 2000).

Lane v. Colvin, No. C13-5658 MJP, 2014 WL 1912065, at *9 (W.D. Wash. May 12, 2014).

"[A]ccordingly, it would be an error for an administrative law judge to focus on a doctor's assessed GAF scores, rather than the doctor's findings and opinions, to credit or discredit medical evidence. Simply put, an administrative law judge cannot draw a reliable inference from a single GAF score, standing alone." Martinez v. Colvin, 2014 WL 3735889, at *3 (D. Mass. July 11, 2014). Therefore, the ALJ in the instant case did not err by failing to accord greater weight to the GAF score assessed by the treating physician or by placing more reliance on the doctors' narrative opinions than on the GAF score.

The treatment notes indicate that in September 2013, plaintiff was diagnosed as having a major depressive disorder, recurring, episodic and moderate. (Tr. 538). However, "[t]he severity of an impairment is measured in terms of its effect on the claimant's ability to work. A mere diagnosis is insufficient to establish that an impairment is severe because it does not reveal the extent to which the impairment limits the claimant's ability to work." Stone v. Astrue, 2013 WL 1212889, at *6 (M.D. Fla. Feb. 26, 2013), report & recommendation adopted, 2013 WL 1212881 (M.D. Fla. Mar. 25, 2013), aff'd, 586 F. App'x 505 (11th Cir. 2014) (citing Moore v. Barnhart, 405 F.3d

1208, 1211 (11th Cir. 2005)); accord Casares v. Astrue, 2013 WL 960229, at *6 (S.D. Miss. Feb. 25, 2013), report & recommendation adopted, 2013 WL 960186 (S.D. Miss. Mar. 12, 2013) (citing Hames v. Heckler, 707 F.2d 162, 165 (5th Cir. 1983)); Morris v. Astrue, 2012 WL 4468185, at *8 (N.D. Tex. Sept. 4, 2012), report & recommendation adopted, 2012 WL 4466144 (N.D. Tex. Sept. 27, 2012) (citing Crowley v. Apfel, 197 F.3d 194, 198 (5th Cir. 1999)); Ranes v. Astrue, 2009 WL 2486037, at *3 (N.D. Tex. Aug. 14, 2009) (citing Randall v. Astrue, 570 F.3d 651, 657-59 (5th Cir. 2009)); Schultz v. Astrue, 2010 WL 2733605, at *9 (E.D. La. June 8, 2010), report & recommendation adopted, 2010 WL 2733565 (E.D. La. July 8, 2010); Parra v. Astrue,2009 WL 49999, at *5 (N.D. Tex. Jan. 6, 2009) (citing Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988)).

In October 2013, plaintiff reported that he had been doing poorly, with his mood symptoms continuing; however, he reported that he was non-compliant with his medication, having only taken Celexa three times. (Tr. 540). The examiner nevertheless found that Millet exhibited intact memory and fair concentration. (Tr. 541). In November 2013, plaintiff reported feeling "perfect" on some days but not on other days. (Tr. 542). He stated that he takes his medication when he feels he needs it. Id. The examiner noted that, overall, plaintiff was "much improved," and his mood symptoms were "mild." Id. The treatment notes further indicate that plaintiff continued to exhibit intact memory and fair concentration. Id.

Based on the foregoing substantial evidence, the ALJ concluded that "it has not been substantiated that the claimant had significant functional limitations with regard to memory and concentration during the relevant adjudicative period. . . . [T]he occupations cited by the vocational expert . . . are all classified as unskilled with a SVP of 2 . . . As such, it appears that even if the claimant did have some significant degree of limitation in this regard, he still would have been able to perform those jobs." (Tr. 80–81). The ALJ noted that the treatment notes indicate that plaintiff's irritability improved with adherence to his psychiatric medication regimen and Millet's testimony that he attends church services every Sunday "indicate that [he] should at least have been able to engage in occupations requiring only direct interaction with the general public and occasional routine workplace changes." (Tr. 81).

In addition to plaintiff's medical records, the ALJ considered the opinion evidence, but found that only one opinion, that of Dr. Nicholas Clayton, M.D., related to the relevant time period and accorded little to no weight to the State agency medical consultants' opinions based on the additional evidence submitted. (Tr. 81–82). The ALJ found that the opinions from Dr. Donna Mancuso, M.D., in April 2015 (Tr. 639), and another, illegible source in April 2015 (Tr. 637) did not relate to the relevant adjudicatory period. (Tr. 81–82).

As to Dr. Clayton's opinion, the ALJ noted that the doctor opined that plaintiff could lift/carry 20–30 pounds occasionally, lift/carry 10–15 pounds frequently,

stand/walk for four hours, but needed to alternate sitting and standing and required 20-minute breaks. (Tr. 81, 638).    Dr. Clayton also opined that Millet could stoop occasionally, never climb ladders or stairs, and did not have limitations with his hands, reaching, or working with the public. (Tr. 81, 638).  The ALJ afforded only partial weight to Dr. Clayton's opinion, finding that he was not a treating physician because he only examined plaintiff on one occasion. (Tr. 81, 638, 775–80).  The ALJ concluded that Dr. Clayton's functional assessment regarding plaintiff's ability to walk, stand and his other postural limitations was based on a diagnosis of osteoarthritis, which was not supported by the evidence in the record as a whole. (Tr. 81, 780). Martinez v. Chater, 64 F.3d 172, 176 (5th Cir. 1995) (per curium) (internal  citations and brackets omitted) ("The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion.").  The ALJ also found that Dr. Clayton's assessment was inconsistent with the record demonstrating that Millet's pain in his legs was alleviated with over-the-counter medication. (Tr.81). A medical condition that can reasonably be remedied by surgery, treatment or medication is not disabling.  Muckelroy v. Astrue, 277 F. App'x 510, 511-12 (5th Cir. 2008) (citing Burnside ex rel. Burnside v. Bowen, 845 F.2d 587, 592 (5th Cir. 1988), abrogated on other grounds by Sullivan v. Zebley, 493 U.S. 521, 527 (1990)); Hebert v. Barnhart, 197 F. App'x 320, 323 (5th Cir. 2006) (citing Johnson v. Bowen, 864 F.2d 340, 348 (5th Cir. 1988)); Leblanc v. Chater, 83 F.3d 419, 1996 WL 197501, at *3 (5th Cir. 1996); Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987).  The

ALJ found that the "rest of Dr. Clayton's opinions seem more supported by the benign findings documented in the medical evidence of record" and were considered by the ALJ in his residual functional capacity finding. (Tr. 81).

Thus, the ALJ in the instant case found that Millet had the residual functional capacity to perform light work, with the extertional, postural and environmental limitations noted above. (Tr. 75–83). Because the ALJ, in evaluating the evidence in the record and the testimony of the vocational expert, found that plaintiff carried his fourth-step burden to show that he could not return to his past relevant work, (Tr. 83), "the 'burden shift[ed] to the Commissioner on the fifth step to show that the claimant [could] perform other substantial work in the national economy. Once the Commissioner [made] this showing, the burden shift[ed] back to the claimant to rebut this finding.'" Bayer v. Colvin, 557 F. App'x 280, 286 (5th Cir. 2014) (quoting Perez, 415 F.3d at 461).

In finding that plaintiff had the residual functional capacity to perform other substantial work as a janitor, housekeeping cleaner or merchandise marker, the ALJ considered the functional capacity findings above and Millet's age, education and work experience in conjunction with the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2. (Tr. 83–84). As noted above in the summary of the hearing transcript, the ALJ asked the vocational expert in the second hearing whether jobs existed in the national economy for an individual matching Millet's age, education, work experience and residual functional capacity, and the vocational expert testified that

37

significant number of the following jobs existed in the national economy, such that Millet could have performed their requirements: janitor, housekeeping cleaner, and merchandise marker. (Tr. 84, 168–69). The vocational expert's testimony was consistent with the definitions provided in the Dictionary of Occupational Titles, and the ALJ accepted the vocational expert's testimony. (Tr. 84, 166–69). "The ALJ expressly and rightly relied on the testimony of . . . the vocational expert, in reaching this conclusion. [Plaintiff] offered no contrary evidence and thus did not satisfy his burden to prove that he could not perform the kinds of jobs identified by" the vocational expert. Masterson v. Barnhart, 309 F.3d 267, 273 (5th Cir. 2002).

Substantial evidence supports the ALJ's acceptance of the vocational expert's testimony at Step Five of the sequential evaluation. Defendant correctly notes that "[w]hen an ALJ's hypothetical question[s] to the [vocational expert] reasonably incorporates the restrictions and impairments that the ALJ recognized, as in this case, the ALJ may properly accept the [vocational expert's] testimony." Record Doc. No. 19 at p. 13 (citing Tr. 84,  167–69; Bowling v. Shalala, 36 F.3d 431, 436 (5th Cir. 1994) (per curium)). Thus, substantial evidence supports the ALJ's findings as to plaintiff's residual functional capacity and whether there were jobs that existed in significant numbers in the national economy that plaintiff could have performed. Plaintiff's second assignment of error lacks merit.

38

<u>CONCLUSION</u>

The ALJ used the appropriate legal standards to weigh and resolve conflicts in the evidence. Her findings that the relevant adjudicatory period was from February 2, 2013 to June 30, 2014, the date Millet was last insured; her evaluation of the competent medical evidence in reaching her residual functional capacity finding that Millet could perform light work with the limitations described in the her decision; and her reliance on the vocational expert's testimony in finding that he could perform the requirements of the positions of janitor, housekeeping cleaner and merchandise marker are all supported by substantial evidence.

**<u>RECOMMENDATION</u>**

For the foregoing reasons, **IT IS RECOMMENDED** that plaintiff's appeal be denied and his complaint be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such

consequences will result from a failure to object. <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[14]

New Orleans, Louisiana, this _____30th_____ day of September, 2019.

_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[14] <u>Douglass</u> referred to the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen (14) days.

40